# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| FULLER MARINE SERVICES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 2:15-cv-212-NT |
| | ) |
| F/V WESTWARD, official number 690723, gear, tackle, anchors, etc., *in rem*, | ) |
| | ) |
| Defendant. | ) |

### ORDER ON VALUE OF THE SALVAGE LIEN

On June 4, 2015, the Plaintiff Fuller Marine Services, Inc. filed a Verified Complaint against the *F/V Westward* (O.N. 690723), her respective gear, tackle, anchors etc., seeking foreclosure of a maritime salvage lien on the vessel. On June 8, 2015, the United States Marshal for the District of Maine arrested and took the *F/V Westward* into the Marshal's custody and, upon Order of the Court, transferred possession of the vessel to Fuller Marine as substitute custodian. After notice was published only one claim was filed. Claim (ECF No. 22). On July 20, 2015, the Plaintiff moved for entry of default against all but the sole claimant. Motion for Entry of Default (ECF No. 20).

On August 14, 2015, the Court granted the Plaintiff's motion for default and scheduled a hearing to determine the amount of the Plaintiff's salvage lien. Hours before the hearing was to begin on September 14, 2015, attorney Stephen Ouellette, representing the *F/V Westward*'s owner Dennis Murphy, filed a Motion to Remove

Default and to File an Answer and Claim Late by Owner Dennis Murphy. (ECF No. 28). At the hearing, attorney Ouellette stated that he would not object to any evidence, and he was not asking to cross-examine any witnesses or challenge the value of the salvage operation. Attorney Ouellette stated that he was there solely to assert the legal position that a salvage lien does not attach to a vessel's fishing permits.

### I. LEGAL BACKGROUND

There is no precise formula utilized by courts to determine salvage awards, and comparisons are difficult because salvage efforts tend to be unique. *B.V. Bureau Wijsmuller v. United States*, 702 F.2d 333, 339 (2d Cir. 1983); *see Allseas Maritime v. M/V Mimosa*, 812 F.2d 243, 246 (5th Cir. 1987) (award must be calculated on fact-specific basis). However, some general principles have emerged. Salvage awards should be liberal, based not only on services rendered, but on the idea that salvors should receive bounties to encourage others to help vessels in distress. *The J.C. Pfluger*, 109 F. 93, 95 (N.D. Cal. 1901). Awards should, therefore, not be computed based on a quantum meruit principle but rather as rewards. *The Blackwall*, 77 U.S. 1, 14 (1869). Courts grant more generous awards to professional salvors than to "chance salvor[s]" because they want to provide incentive for people to possess the "unique skills and . . . maintain [the] expensive equipment" required for salvage efforts. *B.V. Bureau Wijsmuller*, 702 F.2d at 340.

The value of the salvage award cannot exceed the value of the property saved. *See R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 286 F.3d 194, 204 (4th Cir.

2

2002) ("Courts have held that [a salvage] award cannot exceed the value of the property itself."); *M/V Mimosa*, 812 F.2d at 246 ("The salvage award is . . . limited by the value of the property saved . . . ."); *Lambros Seaplane Base v. The Batory*, 215 F.2d 228, 234 (2d Cir. 1954) ("[A]mongst the factors which affect a salvage claim are the values . . . of the vessel or property saved . . . .").

The Plaintiff asserts that fishing licenses, as appurtenances of the vessel, are part of the value of the ship. The owner of the *Westward* takes the opposite position, arguing that fungible fishing licenses are not part of the "property saved" and cannot be considered as part of the value of the vessel. *Gowen v. F/V Quality One*, 244 F.3d 64, 67-70 (1st Cir. 2001), addressed a similar claim. There the court held that a vessel's fishing permits were appurtenances to the vessel and therefore subject to a lien on the vessel. Though *Gowen* involved a lien for wharfage and repairs, the reasoning of the First Circuit's reasoning applies equally here.

> [N]ot only the market value but the creditworthiness of the fishing vessel may well depend on its permits quite as much as on its engine, physical dimensions, and navigation equipment. Maritime liens underpin the extension of credit to fishermen, and this mechanism for ready credit would be impaired by excluding from the lien the permits that allow vessels to carry on their accustomed fishing activities. Thus, in the large, fishermen seeking repairs and supplies on credit are likely to benefit from treating a vessel's permits as appurtenances.

*Id.* at 68-69. Just as "the mechanism for ready credit would be impaired by excluding from the lien the [fishing] permits," so too would the policy of encouraging salvors. I see no reason to carve out a "salvage lien" exception to the traditional rule that maritime liens attach not only to the vessel but to any appurtenance which is essential to the vessel's mission. *Id.* at 67.

In addition to these general principles, in *The Blackwall*, the Supreme Court enumerated six factors related to the salvor's skill and risk in the calculation of a salvage award:

> (1) The labor expended by the salvors in rendering the salvage service. (2) The promptitude, skill, and energy displayed in rendering the service and saving the property. (3) The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed. (4) The risk incurred by the salvors in securing the property from the impending peril. (5) The value of the property saved. (6) The degree of danger from which the property was rescued.

*The Blackwall*, 77 U.S. at 14. These factors take into consideration both the cost to the salvors of performing the service and the benefit to the salvee.

## II. APPLICATION OF *THE BLACKWALL* FACTORS[1]

On the morning of January 9, 2015, Robert Begin noticed that the *F/V Westward*, a 123-foot steel-hulled fishing vessel, had broken loose from her mooring in Boothbay Harbor, Maine and was pushing up against the rocky shore across the harbor. Begin contacted his boss, Charles Fuller, the owner of Fuller Marine, and the two drove around the harbor to get a better look at the vessel.[2] When they arrived at the scene the winds were near gale and the tide was coming in. They determined that the *F/V Westward* was in danger of either sinking or coming free from the rocks and smashing into the nearby piers of the Boothbay Harbor Shipyard and the Tugboat Inn. Fuller and Begin spoke with Eric Graves, the president of the Boothbay

---

[1] The evidence presented at the hearing on September 14, 2015 took the form of exhibits and testimony by Charles Fuller, Robert Begin, Eric Graves, Jeanne Fuller, and Nelson Long. The evidence was not disputed.

[2] Among other services, Fuller Marine offers salvage operations on the coast of Maine.

Harbor Shipyard, who reported that the closest salvage vessel was a tug out of Bath, Maine, which was a day away. Although Fuller had never before attempted to salvage such a large vessel, he offered to try the rescue. Graves thought it was a long-shot but was happy for any assistance.

At the hearing Fuller and Begin described the operation. Two of Fuller Marine's boats – the *Miss Carla* and a Carolina skiff, valued at $100,000 and $10,000, respectively – were used to pull the *F/V Westward* off the rocks. After securing a line on the *F/V Westward*, the *Miss Carla* started towing in reverse. It took forty-five minutes of hard pulling and the help of the rising tide to free the *F/V Westward* from the rocks. All the while, the Carolina skiff, equipped with pushing bars and manned by Begin, shoved hard against the *Miss Carla's* starboard side to keep her from blowing off course. Photographs of the salvage make clear that Begin took the brunt of the cold spray kicked up by the *Miss Carla.* Begin said he held on tightly because he knew that if he was thrown overboard he would not survive long in the icy water. Once the *F/V Westward* came free of the rocks, the *Miss Carla* had to deftly maneuver through the crowded harbor to a mooring that belonged to the United States Coast Guard.

Fuller Marine mobilized its men on the water with equipment at the ready within an hour after first seeing the *F/V Westward* that morning. The successful effort to save the *F/V Westward* took four men almost eight hours. After the salvage operation was complete, the *F/V Westward* was inspected. There was no identifiable damage to the vessel. Eric Graves described the mission as "miraculous."

In April 2015, Marine Safety Consultants, Inc. surveyed the *F/V Westward* and valued the vessel at $30,000-$40,000. Marine Safety Consultants Survey (ECF No. 5-2). Nelson Long, a commercial fishing vessel broker, testified that the *F/V Westward's* fishing licenses were worth $100,000.

The following facts are relevant to the *Blackwall* factors. The Plaintiff's salvage effort tied up four men for eight hours. The Fuller Marine team reacted promptly with great skill and energy. They put at risk two vessels valued collectively at $110,000. Given the near gale winds, icy conditions, and crowded harbor, Fuller Marine undertook great risk in saving the *F/V Westward*. Both boats and lives were in jeopardy during this salvage operation. Had anyone slipped and fallen into the harbor, they would have suffered hypothermia within minutes. The value of the property saved includes the fishing vessel with appurtenances, which was assessed at $130,000. In addition, the mission likely saved Boothbay Harbor Shipyard's pier and possibly the adjacent pier belonging to The Tugboat Inn. The Plaintiff did not introduce evidence of the value of those properties. I find that if no rescue effort had been undertaken, substantial damage to the vessel and nearby property would have occurred.

### III. CONCLUSION

I have reviewed the list of expenses Fuller Marine submitted in connection with the salvage operation and I find them to be reasonable. Pl.'s Ex. 23. I further find that the *Blackwall* factors support an award of $28,723.08 for Fuller Marine's

salvage efforts.[3] Accordingly, the Clerk shall enter Judgment for the Plaintiff in the amount of $28,723.08.

**SO ORDERED**.

/s/ Nancy Torresen  
United States Chief District Judge

Dated this 24nd day of September, 2015.

---

[3] The Plaintiff also put into evidence an estimate of the costs associated with the care and custody of the *Westward* for the five months before it filed this action on June 4, 2015. Pl.'s Ex. 20. Although the Plaintiff presented general testimony about the costs associated with the custody and care of the vessel after the salvage operation was complete and prior to filing this suit, those costs do not appear to be part of the salvage claim but may be the subject of a maritime lien. In addition, Exhibit 20 details the costs of the inspections and mooring fees that have accrued since the Plaintiff was appointed substitute custodian on June 8, 2015. Pl.'s Ex. 20. The costs incurred as the substitute custodian may be compensable out of any proceeds of the sale but are likewise not part of the salvage claim.